IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: ) | |
| GAS-MART USA, INC. *et al.*, ) | |
| ) | Case No. 15-41915 |
| Debtors. ) | Chapter 11 |
| ) | |
| _____ ) | |
| ) | |
| RICHARD S. LAUTER, NOT INDIVIDUALLY | |
| BUT SOLELY AS THE CREDITOR TRUSTEE | |
| OF GAS-MART USA., INC. CREDITOR | |
| TRUST, | |
| ) | Adversary No. 17-4072 |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| WELLS FARGO BANK, N.A., | |
| ) | |
| ) | |
| Defendant. ) | |
| ) | |

## **MEMORANDUM OPINION**

This adversary proceeding comes before the Court on the Complaint ("Complaint") filed by Plaintiff Richard S. Lauter, not individually but solely as the Creditor Trustee of Gas-Mart, Inc. Creditor Trust ("Plaintiff") against defendant Wells Fargo Bank, N.A. ("Defendant" or "Wells Fargo"). Plaintiff asserts that certain payments to Wells Fargo should be avoided as preferential transfers under 11 U.S.C. § 547(b) and Wells Fargo contends that payments it received were a contemporaneous exchange for new value in accordance with § 547(c)(1).

This is a core proceeding under 28 U.S.C. §157(b)(2)(F) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a) and (b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 7052 of the Federal Rules of

1

Bankruptcy Procedure. For the reasons set forth below, the Court finds that Wells Fargo has met its burden of proving that payments it received were a contemporaneous exchange for new value in accordance with § 547(c)(1)[1].

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following relevant facts are uncontroverted per the Joint Pre-Trial Statement Stipulated Material Facts filed by the parties. Debtor Gas-Mart USA, Inc. ("Gas-Mart" or "Debtor") owned and operated gas stations and convenience stores in Iowa, Illinois, Indiana, Nebraska and Wisconsin. On July 2, 2015, Gas-Mart and related entities filed voluntary petitions under Chapter 11. In the confirmation order, Plaintiff was appointed as the Creditor Trustee for the Creditor Trust and vested with the power to prosecute avoidance actions. Prior to bankruptcy, Gas-Mart held deposit accounts with Wells Fargo subject to certain treasury management agreements ("TM Agreements"). On July 25, 2014, Wells Fargo notified Gas-Mart it was in breach based upon overdrafts in excess of $5 million. Thereafter, Wells Fargo and Gas-Mart entered into an agreement to repay the overdraft debt and granting Wells Fargo security interests in substantially all of its assets pursuant to security agreements. On October 20, 2014, the parties entered into a forbearance and modification agreement and on March 17, 2015, Wells Fargo made demand on Gas-Mart for payment in full based on failure to comply with the forbearance agreement. On April 28 they entered into a second forbearance and modification agreement.

In March 2015, Gas-Mart entered into an agreement with TA Operating LLC to sell all of

---

[1] Wells Fargo makes no attempt to defend the $73,000+ of miscellaneous payments made before the closing of the asset sale and the Court will enter judgment against Wells Fargo for that amount and sustain the objection to its claim until that sum is paid pursuant to § 502(d).

its real and personal property assets at 19 Gas-Mart locations in the Kansas City area for $27 million (the "Travel Center Sale"), plus the value of inventory on the sale date. The sale proceeds were used to pay Gas-Mart's secured lenders and lienholders. Gas-Mart sold the inventory for $608,788.63 on the sale date of April 30, 2015. Wells Fargo held junior mortgages to Great Southern Bank on Stores 1, 3 and 7 (Pl. Ex. 6_000048). Sun Life was the senior secured creditor on all other stores and received $14,730,724 from the Travel Center Sale in partial payment and released its lien on all assets of the 19 stores and consented to the Sale. Gas-Mart paid Equity Bank and Great Southern Bank full payment of their debts and UMB Bank partial payment of its debt. Wells Fargo received from Gas-Mart $1.3 million in partial payment on its debt and Gas-Mart also made payments to Wells Fargo in the amount of $73,490.67 prior to the sale on account of accrued interest ("Preference Period Transfers"). See footnote 1.

Additionally, certain of the stores managed by Gas-Mart were owned by KCRC and supplied fuel by KCRC affiliate, Phillips 66. Gas-Mart was delinquent in its payments to KCRC and agreed to return locations and inventory in exchange for a credit of approximately $1.5 million that it owed to KCRC. Wells Fargo claimed that the inventory should not have been transferred to KCRC without its consent because the inventory was subject to Wells Fargo's lien. Thereafter, in order to close the Travel Center Sale, Phillips 66 agreed to provide fuel credit of up to $2 million to Gas-Mart to cover fuel purchases on the condition that Wells Fargo released Phillips 66 from any liability relating to the inventory transfer. Subsequently, Phillips 66, KCRC and Wells Fargo entered into an agreement wherein Wells Fargo provided the requested release.

On June 29, 2017, Plaintiff filed a complaint against Wells Fargo seeking, of relevance

3

here, the avoidance and recovery of the Preference Period Transfers pursuant to §§ 547 and 550.

## II. LEGAL ANALYSIS

To avoid a pre-petition transfer as a preference under § 547(b), six elements must be proven: 1) a transfer of an interest of the debtor in property, 2) on account of an antecedent debt, 3) to or for the benefit of a creditor, 4) made while the debtor was insolvent, 5) within 90 days prior to the commencement of the bankruptcy case, 6) that left the creditor better off than it would have been if the transfer had not been made and the creditor had asserted its claim in a Chapter 7 liquidation. *In re Graff*, 454 B.R. 745, 749 (Bankr. W.D. Mo. 2011). The plaintiff must establish each of these elements by a preponderance of the evidence. *See In re Libby Int'l, Inc.*, 247 B.R. 463, 466 (8th Cir. BAP 2000).

The prima facie case was conceded by the parties and the litigation focused on Wells Fargo's defense of whether the Preference Period Transfers were contemporaneous exchanges for new value and, therefore, protected from avoidance under § 547(c)(1). Wells Fargo has the burden of proof and must establish the facts sustaining the defense by a preponderance of the evidence. 11 U.S.C. § 547(g). The elements for the contemporaneous exchange defense are: (1) an exchange involving new value to the debtor; (2) the exchange was intended to be substantially contemporaneous; and (3) the exchange was in fact substantially contemporaneous. 11 U.S.C. § 547(c)(1); *see In re Xurex, Inc.*, 2017 WL 3084400 (Bankr. W.D. Mo. 2017). Wells Fargo identifies two elements of value as supporting the defense. First, the release by Wells Fargo of its liens on substantially all of the Debtor's assets, including the personal property and specifically the furniture, fixtures and equipment, in connection with the closing of the Travel Center Sale. The second element of value is its release of Phillips 66 on a claim for

4

conversion of collateral facilitating the provision by Phillips 66 of an extension of credit to Gas-Mart on previous and future fuel purchases facilitating operation of its business.

The statute defines "new value" as: "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation."  11 U.S.C. § 547 (a)(2).   A lien release can be new value if there is equity in the property released. *See In re Fuel Oil Supply & Term., Inc.*, 837 F.2d 224 (5th Cir.1988) (cancellation of letter of credit freed up collateral that would be used to satisfy the claims of other creditors); *Kenan v. Fort Worth Pipe Co. (In re George Rodman, Inc.),* 792 F.2d 125 (10th Cir.1986); *see also, In re Philip Services Corp.*, 359 B.R. 616 (Bankr. S.D. Tex. 2006); *Cocolat, Inc. v. Fisher Dev., 817 Inc. (In re Cocolat, Inc.),* 176 B.R. 540, 547 (Bankr.N.D.Cal.1995) ("the release of a lien that has already been recorded on the debtor's property clearly qualifies as '**new value**' ").   In addition, new value does not have to be given by the defendant; it can be given by a third party if it was facilitated by an action of the defendant. *See In re Kumar Bavishi & Assoc.*, 906 F.2d 942 (3rd Cir. 1990). Substitution of an obligation for another obligation does not constitute new value; neither does a mere extension of a deadline to act or temporary forbearance. *See In re Spada*, 903 F.2d 971 (3rd Cir. 1990); *In re Foxmeyer Corp.*, 286 B.R. 546 (Bankr. D. Del. 2002). Substantial modification of an existing agreement, however, can be new value and the Court must look at the facts. *See In re F&S Central Mfg. Corp.*, 53 B.R. 842, 850 (Bankr. E.D.N.Y. 1985).

Lien release as new value is an argument with two components to it.   The Court must first evaluate the fair market value of the underlying property then assess the priority and amount

of other liens on the property to determine if there was equity made available to the debtor as a result of release of the liens. Wells Fargo claims the value of the property on which it released its liens was $1,402,380 and this is supported by its appraiser. *See* Defendant's Exs. DDD & EEE. The appraisal is subject to numerous criticisms, but it also tends to be corroborated by two other measures of value.  While Plaintiff raised a number of questions about the appraisal, he failed to quantify the impact of those critiques.  In other words, he did not demonstrate how much of an impact those shortcomings would have on the valuation of the property and to what extent they might reduce the assessed value.  Neither did the Plaintiff offer an alternative valuation.

The Defendant's appraiser, Gordon Brothers, performed what is referred to as a desktop appraisal, meaning an appraisal conducted without inspection of the assets.  Although Plaintiff criticizes the appraisal for that reason, it is a recognized form of appraisal alternative to a standard appraisal and does not lack validity solely for that reason.  Defendant's appraiser did inspect the assets then in place at 16 of the 19 locations and was able to get a better idea of the composition and condition of the assets by comparing his inspection to the descriptions and photographs in the prior appraisals obtained by Gas-Mart in 2014, referred to as the Hopkins appraisals.  He did not have a detailed equipment list, but did have historical cost information by category from Gas-Mart's records.  He did not talk to any employees of Gas-Mart but there is no indication of what might have been needed from Gas-Mart's employees or could have been obtained from them that would have an effect on the resulting value.  The appraiser used a conservative assumption about the age of the assets, assuming all were put in service at the time the respective store was opened, which would subject them to the maximum amount of physical depreciation.  No adjustment was made for functional obsolescence but there was no evidence

to indicate that such a deduction was necessary or appropriate. Plaintiff also complains that Defendant's appraiser did not factor in the effect of encumbrances. The Court considers this irrelevant. The process of determining whether the released liens had value is a two-step one, starting with the fair market value of the assets and then considering that in light of the amount and priority of the liens on the assets. The first task is the appraiser's. The second is the Court's, based on the evidence. Plaintiff also criticized the appraiser because he made the assumption that the useful life of the car washes was 10 years and that they would have been replaced at that point. Plaintiff complains that given Gas-Mart's financial distress, this may not have been an accurate assumption. Defendant's appraiser, however, examined 12 of the 15 locations that had car washes and talked to manufacturers' representatives to assess the value and life expectancy of that equipment. This inspection and information, along with the review of evidence from the Hopkins appraisals permitted him to determine that some of them had been replaced as assumed.

With regard to many of these critiques, Plaintiff had done little more than raise questions about the appraisal rather than to demonstrate serious flaws. None of them is quantified. In other words, there is no evidence or argument that demonstrates the significance of the problems noted to value determination. In addition, no alternative valuation of the assets was offered by the Plaintiff. The Court agrees that some of these situations are less than ideal. It might feel differently if the appraisal report offered by Gordon Brothers was the only evidence of value. It was not. Rather, the appraisal reports tend to be corroborated by two other sources of valuation, an earlier set of appraisals by Hopkins and fixed asset schedules prepared by the buyer allocating its consideration to the assets purchased. *See* Defendant's Ex. XXX.

As to the Hopkins appraisals, it is true, as Plaintiff notes, that the Hopkins appraisal

7

ascribed a slightly different and lower value. As Defendant points out, however, value was lower only by $12,380 which is less than 1% of the total aggregate value of the assets.

Defendant also obtained a fixed asset schedule prepared by the buyer after the sale allocating the consideration it paid to the assets purchased. *See* Defendant's Ex. SS. That schedule showed value for the furniture, fixtures and equipment of $1,679,663, somewhat higher than that ascribed to them by Defendant's appraiser. Plaintiff notes that the purpose of the creation of this schedule is unclear. Evidence shows that Defendant requested it as an aid to assessing the value of the assets. Defendant's Ex. SS. There is no indication that it was tainted in any way. The Plaintiff also argues that the buyer had a motive to ascribe a higher valuation to the assets because they would be subject to depreciation which could be deducted from income on the buyer's tax returns. While this may be true theoretically, there is no evidence that that bias came into play in this instance. Moreover, as Defendant points out, the asset valuation is higher than that ascribed by Defendant's appraiser, so, even if it is discounted somewhat, it would still be consistent with Defendant's assertion as to the value of the assets.

The second component to determining the value of the lien release is to consider the priority and amount of other senior liens on the property. Wells Fargo had a second position on the furniture, fixtures and equipment in each of the stores, second in three instances to Equity Bank and in others to Sun Life. Plaintiff's Ex. 5_000042. Equity Bank was paid in full from the proceeds of the sale. Sun Life, although not paid in full, released its liens in exchange for a payment of just $14 million. Wells Fargo does not claim to have had value in any of the mortgages it held, because of mortgages held by others on those properties. Neither does it ascribe value to its security interest in the inventory, as the IRS had a prior claim to the inventory. The approximately $603,000 paid by the buyer for inventory was all paid to the

8

Internal Revenue Service. As a result, the Internal Revenue Service agreed to release its liens. Although Plaintiff contends otherwise, the record shows that the IRS subsequently amended its proofs of claim eliminating any secured portion. Although Plaintiff claims that those amendments were a result of having received distributions in the case from other asset dispositions, the evidence it cites does not support that contention.

Plaintiff contends that Wells Fargo's liens were valueless and that release of the liens provided no new value to the debtor which could qualify under the statutory exception. The parties largely argue past each other with regard to the value of the liens. The Plaintiff argues that a strict waterfall distribution of proceeds based upon presale amounts and claim priorities would result in no value to Wells Fargo. He also complains that Defendant's argument that there was sufficient value in the assets to permit a distribution to Wells Fargo from the sale proceeds is nothing more than a restatement of the actual distribution of proceeds rather than a demonstration of the real value of the liens. Wells Fargo points out that what the strict waterfall may have required is not relevant because Sun Life agreed to release its liens in the assets sold in exchange for a payment of considerably less than the total amount it was owed. Defendant argues that Sun Life did this in part because it had other collateral from the debtor or affiliates to secure its remaining claim. In essence, the actual distribution effectuated a marshalling of assets as a result of which there was equity for Wells Fargo. Equity Bank was paid in full. What Sun Life actually accepted is a reflection of the value it placed on its liens. At that agreed level, there was enough to make the payment to Wells Fargo and leave some small sum for the debtor. This is shown by Wells Fargo's analysis of the distribution of the proceeds and is actually demonstrated as well by Plaintiff's own expert's report after one first corrects for a $600,000 error with respect to the sale and distribution of proceeds of the inventory. *See*

Plaintiff's Ex. 6.  In his brief, Plaintiff cites his expert's rebuttal report on the valuation of Wells Fargo's liens. Plaintiff's Ex. 7.  Although this document was admitted into evidence at trial, it was not the subject of testimony offered by Plaintiff's expert witness.  Defendant points out in its post-trial briefing, however, that analysis was solely of the value of Wells Fargo's mortgages on real property not its liens on furniture, fixture and equipment.  It is clear that the sale transaction would not have closed without the lien releases by Wells Fargo, because the assets were to be conveyed to the buyer free and clear of liens.

In addition to releasing its liens, Wells Fargo also released a claim it asserted against Phillips 66 as the transferee of certain collateral in which Wells Fargo claimed an interest made without its knowledge or consent.  Phillips 66 demanded that release as a condition to restructuring the Debtor's obligation for fuel received and extending additional credit to Gas-Mart for fuel purchases.  As even Plaintiff's witnesses testified, the Phillips 66 credit was essential; Gas-Mart would have been out of business without it.  Because of the required distributions to secured creditors, Gas-Mart would not receive any of the proceeds of the asset sale and lacked sufficient funds with which to continue to operate.  Therefore, it needed to restructure its existing obligation with Phillips 66 for fuel already purchased as well as obtain credit for new fuel purchases.  It also needed to keep its agreement with Phillips 66 intact, as the buyer had given notice of its intention to assume that contract as a part of the asset sale.  As Wells Fargo notes, this agreement transformed what was a 10-day obligation, which Gas-Mart had no funds to pay, and extended it, after the execution of the promissory note in early July, to one extending over two years and two months.  Also, Gas-Mart actually made no payments on these payables during the two-month period after the closing of the asset sale or at any time.

Plaintiff notes, and it is true, that Defendant must quantify the value it claims was

received by Gas-Mart in exchange for the release it offered to Phillips 66. Wells Fargo argues that value is established as subsequent transactions entered into between Phillips 66 and Gas-Mart, the consignment agreement approved by the Bankruptcy Court early in the Chapter 11 proceeding. As a part of that proceeding, Phillips 66 agreed to provide fuel at Gas-Mart locations if it retained ownership of the fuel and received the proceeds of sale. In exchange for that, it paid the sum of $12,000 per month per each location which translates to $276,000 per month or $552,000 for a two-month period. Wells Fargo argues that this establishes the value of the credit given as a result of its claim release. Plaintiff argues that the agreement actually approved by the Court characterizes these payments as being, at least in part, fees for certain services to be provided by GasMart to Phillips 66 subsequent to the filing. However, the motion filed by Gas-Mart with the Bankruptcy Court, as quoted by Defendant, clearly characterizes the payments as being in exchange for the receipt of the gasoline revenues as Wells Fargo submits. Defendant's Exs. EEEE, FFFF & GGGG. Moreover, as Defendant argues, this number may underestimate the value to Gas-Mart of the ability to receive those revenues as it does not take into consideration the accompanying inside sales which become possible only as a result of having gasoline to sell to customers and would have been lost absent that ability. In addition, Defendant notes that other data showed that GasMart's actual gas purchases from Phillips 66 in this time period may have been much higher (as high as $1,956,000 per month). *See* Defendant's Ex. GGGG. While Plaintiff complains that the evidence fails to demonstrate that Gas-Mart operated at a profit in this time frame, that is not necessary in order for Gas-Mart's ability to receive this revenue to qualify as new value under the exception. *Cf. In re Ross*, 1997 WL 331830 (Bankr. E.D. Penn. 1997) (finding the amount of new value is measured by the benefit received by the debtor and not by the existence of any additional property included in the

11

estate that would be available for distribution to creditors).

As for the requirement that the exchange actually be substantially contemporaneous, there is little question.   The payments received by Wells Fargo which Plaintiff seeks to recover as preferential and the releases of liens and claims made by Wells Fargo all occurred simultaneously with the closing of the Travel Center Sale or, in the case of the $100,000 payment, within 24 hours prior.   This is unquestionably actually substantially contemporaneous. As to the requirement that the parties intended the exchanges to be substantially contemporaneous, there is similarly little doubt.   All of these payments and releases were negotiated as part of one deal that closed on April 30.   Plaintiff contends that the evidence does not establish that the $100,000 payment made the day before closing was intended to be in exchange for the other releases and was simply demanded as a precondition to further negotiations and to cover certain fees and expenses. Plaintiff's Ex. 35.   The evidence, however, establishes that it was essentially an advance payment on a deal already struck. Defendant's Exs. M, O, Q & U.   The fact that it did not come from the sale proceeds is not relevant.   Plaintiff argues that that portion of the value component of Defendant's claim release attributable to the two-year restructuring is not actually contemporaneous or not intended to be, as the note establishing that two-year repayment period for the payable existing between Gas-Mart and Phillips 66 at that time was executed 60 days later. Defendant's Ex. EEEE.   It was, however, just the documentary embodiment of a deal made earlier. Defendant's Exs. Q, U & X.

Overall, given the lien and claims releases, Defendant Wells Fargo gave value of approximately $1.9 million.   Even if some downward adjustment to either component is warranted, it is still reasonable to conclude that the value provided covered the payments made to Defendant Wells Fargo and protects it from avoidance as a preference under the exception for

contemporaneous exchanges.

### III. CONCLUSION

For the reasons stated above and after reviewing the briefs, cited cases, the transcript and provisions of relevant key documents, the Court has reached the conclusion that Wells Fargo has (except with respect to certain transfers made before the sale closing in the amount of $73,490.67) met its burden of establishing that payments it received were a contemporaneous exchange for new value in accordance with § 547(c)(1). The Plaintiff's Complaint to Avoid Preferential Transfer is hereby overruled in part and granted in part. The Court will enter Judgment in favor of Plaintiff in the amount of $73,490.67; and will enter judgment against Wells Fargo for that amount and sustain Plaintiff's objection to its claim until that sum is paid pursuant to § 502(d). The Court will also enter Judgment in favor of Defendant as to the remainder amount of $1.3 million. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law. A separate Order will be entered pursuant to Bankruptcy Rule 9021.

Dated:       March 7, 2019            /s/ Dennis R. Dow

THE HONORABLE DENNIS R. DOW
UNITED STATES BANKRUPTCY JUDGE